# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00826-CV

**Appellant, Waste Management of Texas, Inc. // Cross-Appellant,
Texas Disposal Systems Landfill, Inc.**

**v.**

**Appellee, Texas Disposal Systems Landfill, Inc. // Cross-Appellee,
Waste Management of Texas, Inc.**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. D-1-GN-97-012163, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

This is a defamation case that was previously tried to a jury, reversed and remanded on appeal, and tried to a jury again. In this second appeal, Waste Management of Texas, Inc., challenges, in seven issues, the second jury verdict in favor of Texas Disposal Systems Landfill, Inc., and in one cross-issue, Texas Disposal challenges the district court's application of the statutory cap to the jury's award of exemplary damages. For the reasons set forth below, we will affirm the judgment.

## BACKGROUND

The factual and procedural background of this case is detailed at length in *Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc.*, 219 S.W.3d 563 (Tex. App.—Austin 2007, pet. denied) (*Texas Disposal I*). Generally stated, however, Waste Management and Texas Disposal are competitors in the waste-removal and landfill-services

industry serving the Austin and San Antonio markets. This case arises from Waste Management's January 30, 1997, anonymous publication of a one-page document, titled "Action Alert," to Austin environmental and community leaders. The Action Alert conveyed to its readers allegations that increased traffic and environmental problems would result from Texas Disposal's proposed landfill contract with the City of San Antonio, questioned the environmental integrity of Texas Disposal's landfill in Travis County, and urged recipients of the document to contact public officials in San Antonio, Austin, and the media with the readers' "concerns." After publication of the Action Alert, Texas Disposal filed suit against Waste Management alleging that it had attempted to disparage Texas Disposal's reputation to eliminate it as a competitor and asserting claims for defamation, tortious interference with an existing prospective contract, business disparagement, and antitrust violations based on the alleged conduct. *See id.* at 570. After various motions for summary judgment that eliminated most of these claims, Texas Disposal tried its defamation claim to a jury, which found that statements in the Action Alert were false and made with actual malice, but that Texas Disposal had suffered no damages. The district court entered a take-nothing judgment against Texas Disposal, which it appealed in *Texas Disposal I*.

In *Texas Disposal I*, this Court held, among other things, that the district court had erred by refusing to include a question about defamation per se in the jury charge. Specifically, we held that because there were underlying fact issues regarding whether Waste Management's Action Alert was defamatory per se—i.e., whether the meaning and effect of the words in the Action Alert tended to affect Texas Disposal injuriously in its business—the district court had abused its discretion by refusing to submit Texas Disposal's requested defamation-per-se question and instruction. *Id.* at 583–84. The omitted question would have instructed the jury that a statement is

2

defamatory per se if it affects an entity injuriously in its business, occupation, or office, and then asked the jury to determine if the statements and implications in the Action Alert were defamatory per se. The question further instructed the jury that, in making its determination, it should consider the Action Alert as a whole and in light of the surrounding circumstances. *Id.* at 580–81. Based on that charge-error holding, we remanded the case to the district court for a new trial. *See id.* at 584.

Regarding damages, we held that if the jury found on remand that the statements in the Action Alert were defamatory per se, then Texas Disposal would be entitled to some amount of presumed general damages for injury to its reputation. We based this holding on the legal presumption that a plaintiff who is the subject of a statement that is found to be defamatory per se suffered at least some actual damages even without independent proof of general damages. *Id.* at 584. We further noted that the amount of actual damages is left to the jury's discretion and that proof of actual injury is required to recover special damages such as lost profits, incurred costs, and lost-time value. *Id.* at 581 n.19, 584 n.22.

On remand, the district court included in the jury charge a question on defamation per se with its associated instructions, and the jury found in favor of Texas Disposal, awarding it $450,592.03 for reasonable and necessary expenses, $0 for lost profits, $5 million for injury to Texas Disposal's reputation by the defamatory statements, and $20 million as exemplary damages based on the jury's finding that Waste Management published the defamatory statements with malice. Applying the statutory cap to the jury's award of exemplary damages, the district court treated the jury's $5 million award for injury to Texas Disposal's reputation as non-economic damages and reduced the exemplary damage award to $1,651,184.06.

3

**Defamation**

The issues in this second appeal solely involve Texas Disposal's claim that Waste Management's publication of the Action alert defamed Texas Disposal. "The law of defamation addresses injury to reputation by communications—usually words." 1 Robert D. Sack, *Sack on Defamation* § 1:1 (4th ed. 2011); *see Texas Disposal I*, 219 S.W.3d at 580; *Black's Law Dictionary* 479 (9th ed. 2009) (defining defamation as the "act of harming the reputation of another by making a false statement to a third person"). The law of defamation encompasses the common law claims of libel and slander. *See Sack on Defamation* at § 1.1. Because of constitutional concerns that often arise in defamation claims, the elements of a cause of action for defamation can vary depending on the identities of the parties and the character of the alleged defamatory statement. *See Sack on Defamation* § 2:1. For example where, as here, the case involves public speech about a matter of public concern, the plaintiff must show that the defendant published a false, defamatory statement about the plaintiff with actual malice.[1] *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 283 (1964); *Texas Disposal I*, 219 S.W.3d at 574–75. In this context, "actual malice" means that the defendant published the statement with knowledge of its falsity or with reckless disregard to its falsity. *See New York Times*, 376 U.S. at 279–80; *Bentley v. Bunton*, 94 S.W.3d 561, 590 (Tex. 2002); *Texas Disposal I*, 219 S.W.3d at 575. Whether a statement is defamatory is a question of law. *See Musser v. Smith Prot. Servs., Inc.*, 723 S.W.2d 653, 654 (Tex. 1987). If the defamatory statement alleges that the plaintiff committed a crime, has contracted a "loathsome disease," is "unchaste" or has committed serious

---

[1] The district court treated Texas Disposal as a public figure and the subject of the Action Alert as a public issue. Because neither party challenges this treatment, we do not address it.

4

sexual misconduct, or tends to injure a person in his office, profession, or occupation, the defamatory statement is considered defamatory per se, which means that the communication will support a cause of action for defamation without proof of actual pecuniary loss. *See Salinas v. Salinas*, — S.W.3d —, No. 11-0131, 2012 WL 1370869, at *2 (Tex. Apr. 20, 2012) (citing *Bentley*, 94 S.W.3d at 604); *Texas Disposal I*, 219 S.W.3d at 580; *Sack on Defamation* § 2:8:2. Stated another way, a finding of defamation per se entitles the plaintiff to a presumption of general damages. *See Bentley*, 94 S.W.3d at 604 (addressing libel per se).[2] This distinction is thought by some to have developed because each of these categories of defamatory statements involves circumstances in which it would be difficult for the subjects of the statement to trace specific financial losses. *See Sack on Defamation* at § 2:8:2. Whether a communication constitutes defamation per se is usually a legal question for the court. *See Texas Disposal I*, 219 S.W.3d at 581.

### WASTE MANAGEMENT'S APPEAL

Waste Management challenges the district court's judgment in seven issues, arguing that the district court erred by (1) instructing the jury that it could award presumed damages without any proof of damages; (2) asking the jury to determine whether statements in the Action Alert were defamatory per se; (3) rendering judgment on Texas Disposal's claim for defamation despite the fact that the cause of action is designed to protect the personal reputation of a natural person, not a business such as Texas Disposal; (4) rendering judgment for Texas Disposal when the evidence was insufficient to show that Waste Management wrote and distributed the Action Alert with

---

[2] In contrast, statements that are defamatory per quod are actionable only upon allegation and proof of damages—i.e., the plaintiff must prove both the existence and amount of the damages. *See Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc.*, 219 S.W.3d 563 (Tex. App.—Austin 2007, pet. denied).

actual malice; (5) rendering judgment for Texas Disposal when the evidence was insufficient to support the $5 million injury-to-reputation award and the finding that the Action Alert was false, and insufficient to show causation and common-law malice; (6) excluding certain of Waste Management's evidence; and (7) awarding exemplary damages that are grossly disproportionate to the offense.

**Presumed damages**

In its first issue, Waste Management asserts that the district court erred in submitting the following question to the jury:

### QUESTION NO. 7

What sum of money, if paid now in cash, would fairly and reasonably compensate [Texas Disposal] for damage to its reputation caused by the publication of the statements or implications regarding which you answered "Yes" to Question No. 4?

. . . .

Damage to reputation in the past.

With respect to the publication of statements and implications regarding which you answered "Yes" in answer to Question No. 6, *damage to reputation may be presumed; no evidence is required of damages*. With respect to the publication of statements and implications, regarding which you answered "No" in your answer to Question No. 6, there must be evidence of damage to reputation proximately caused by that publication. . . .

(Emphasis added.)[3]  Waste Management contends that the emphasized portion of this instruction to Question 7 was improper because it allowed the jury to "award any amount it chose for reputation damages regardless of the evidence" and because it "directed the jury to award excessive damages." We disagree.

Initially, we note that the instruction correctly states Texas law—statements that are defamatory per se are presumed to injure the claimant's reputation and entitle the claimant to recover general damages, including damages for loss of reputation, without proof of injury.  *See Salinas*, 2012 WL 1370869, at *2 (citing *Bentley*, 94 S.W.3d at 604); *Texas Disposal I*, 219 S.W.3d at 584; *Peshak v. Greer*, 13 S.W.3d 421, 427 (Tex. App.—Corpus Christi 2000, no pet.); *see also Black's Law Dictionary* 1334 (defining proof as the "establishment or refutation of an alleged fact by evidence").  Although an argument might be made that the instruction here is awkwardly drafted, it does not, as Waste Management suggests, give the jury the unfettered right to award "any amount it chose."  It merely informs the jury that, having determined that the statements in the Action Alert are defamatory per se, the jury may presume that Texas Disposal suffered damage.  After a semicolon, the instruction then explains that "to presume" damages means that "no evidence is required of damages."  *See Black's Law Dictionary* 1304 (defining "presume" as "[t]o assume beforehand; to suppose to be true in the absence of proof"); *Webster's Third New Int'l Dictionary* 1976 (2002) (defining "presume" as "to accept as true or credible without proof").

---

[3]  Question No. 4 asked the jury whether Waste Management made the false statement in the Action Alert with actual malice—i.e., "knowing it was false or with reckless disregard of whether it was true or not."  Question No. 6 asked the jury whether the statements in the Action Alert "affect an entity injuriously in its business, occupation, or office, or charge an entity with illegal or immoral conduct."

7

The question and instruction also properly limit the jury's award in that, under the question as posed, the jury may only award an amount that "would fairly and reasonably compensate" Texas Disposal for the damage to its reputation. A question that requests fair and reasonable damages cannot be said to direct a jury to award excessive damages or to allow the jury to award any amount regardless of the evidence. Further, perhaps with the exception of nominal damages, any amount awarded by the jury is subject to an evidentiary review. *See Bentley*, 94 S.W.3d at 606 (holding that jury award for injury to reputation subject to evidentiary review); *see also Salinas*, 2012 WL 1370869, at *2 (noting that regarding defamation per se, the law does not presume any particular amount of damages beyond nominal damages and that the amount of damages is a question for the jury). Thus, although the jury may presume that Texas Disposal suffered damage without proof that Texas Disposal suffered damages, it must only award that amount of damages that "fairly and reasonably compensates" Texas Disposal, and on review, there must be evidence supporting the amount awarded. As such, the instruction here was not improper. We overrule Waste Management's first issue.

**Defamation per se**

In its second issue, Waste Management asserts that the district court erred by asking the jury whether certain statements in the Action Alert "tend to affect an entity injuriously in its business, occupation, or office, or charge an entity with illegal or immoral conduct"—i.e., the defamatory-per-se standard—because whether a statement is defamatory per se is a question of law for the court to answer. Rather than ask the jury this "ultimate legal question of defamation per se," Waste Management contends that the district court should have asked the jury predicate questions of fact regarding the exact meaning and effect of the words in the Action Alert and then "entered

8

judgment for Texas Disposal only if defamation per se existed as a matter of law." In making this assertion, Waste Management purports to rely on our decision in *Texas Disposal I*, arguing that we directed the district court to ask the jury the predicate fact questions. We disagree.

In *Texas Disposal I*, we held that although defamation per se is generally a legal question, a trial court may pass that inquiry to the jury if ambiguities exist about the meaning and effect of the words. *See Texas Disposal I*, 219 S.W.3d at 581 (citing *Musser*, 723 S.W.2d at 655). We then determined that the district court's refusal to find in pre-trial rulings that the statements in the Action Alert were defamatory per se did not mean that the court believed the statements were not defamatory per se, but rather demonstrated that the district court "was not convinced as a matter of law that no ambiguities remained on the issue" of whether the statements were defamatory per se. *Id.* Accordingly, because Texas Disposal had preserved charge error by submitting in writing "substantially correct questions and instructions related to these issues" and by objecting in writing to the exclusion of these questions in the proposed charges, we held that it was error for the district court to refuse to submit Texas Disposal's requested question and instructions about defamation per se to the jury when the question was raised by the written pleadings and supported by the evidence, namely evidence that Waste Management defamed Texas Disposal in a manner injurious to its business. *See id.* at 582 (citing Tex. R. Civ. P. 278 for the proposition that "court is required to submit questions, instructions, and definitions raised by written pleadings and supported by evidence" and summarizing Texas Disposal's requested questions and instructions). We also noted that although whether a statement is defamatory per se is generally a legal question, there existed underlying ambiguities in the facts of this case that could not be decided as a matter of law and needed to go to the jury—specifically, "the exact meaning and effect of the words because

9

much of the Action Alert's defamatory character arose not from its blatant statements but, rather, from the impressions it created and inferences it encouraged." *See id.* at 582–83 (citing *Musser*, 723 S.W.2d at 655).

On remand, the district court approved a jury charge that instructed the jury on the meaning of "defamatory" and asked the jury to determine whether certain statements from the Action Alert were defamatory and, if so, whether the statements were made with actual malice. For those statements that the jury found had been made with actual malice, the jury was asked to determine whether those statements "tend to affect an entity injuriously in its business, occupation, or office, or charge an entity with illegal or immoral conduct?" As seen in the chart below, the question submitted to the jury on remand is virtually identical to the question we approved as being "substantially correct" in the appeal of the first trial. *See id.* at 582.

| Omitted question from first trial | Question submitted at second trial |
|---|---|
| "Were any of the following statements, impressions, or implications from the Action Alert, or the Action Alert as a whole, . . . defamatory *per se*?" | "With respect to each of the statements or implications below . . . , does the statement or implication tend to affect an entity injuriously in its business, occupation, or office, or charge an entity with illegal or immoral conduct?" |
| 1. "There are no restrictions on the types of waste that may be disposed of in the [Texas Disposal] landfill, with the exception of hazardous waste." | "There are no restrictions on the types of waste that may be disposed of in the [Texas Disposal] landfill, with the exception of hazardous waste." |
| 2. "The [Texas Disposal] facility applied for and received an exception to the EPA Subtitle D environmental rules."[4] | "The [Texas Disposal] facility "applied for and received an exception to the EPA Subtitle D environmental rules." |

---

[4] "Subtitle D" refers to EPA-promulgated regulations providing minimum federal criteria with which all solid-waste landfills must comply. *See* 40 C.F.R. §§ 258.1–258.75 (2011).

| | |
|---|---|
| 3. "[Texas Disposal] does not use synthetic liners while 'other landfills in Central Texas and San Antonio in similar clay formations are using the full synthetic liner in addition to the clay soils.'" | "Other landfills in Central Texas and San Antonio in similar clay formations are using the full synthetic liner in addition to the clay soils." |
| 4. "The impression or implication created by the Action Alert that the [Texas Disposal] facility is environmentally less protective than other landfills, including [Waste Management]'s Austin Community Landfill." | "The implication that the [Texas Disposal] facility is environmentally less protective than other area landfills, including [Waste Management]'s Austin Community landfill." |
| 5. "The impression or implication created by the Action Alert that the [Texas Disposal] facility does not have a leachate collection system."[5] | "The implication that [Texas Disposal] does not have a leachate collection system." |
| 6. "The Action Alert taken as a whole." | |
| "A statement is defamatory *per se* if it tends to affect an entity injuriously in its business, occupation, or office, or charges an entity with illegal or immoral conduct." | [see above] "does the statement or implication tend to affect an entity injuriously in its business, occupation, or office, or charge an entity with illegal or immoral conduct." |
| "In deciding whether a statement, impression, or implication is defamatory or defamatory *per se*, you are to consider a reasonable person's perception of the statement, impression, or implication in the context of the Action Alert as a whole, and in light of the surrounding circumstances." | "You are to consider an ordinary person's perception of the statement or implication in the context of the Action Alert as a whole, and in light of the surrounding circumstances." |

(Omitted question is quoted from Texas Disposal's "Supplemental Proposed Jury Definitions, Instructions, and Questions" from the first jury trial of this matter; formatting and order changed in remand question for comparison purposes.) As such, the district court submitted a question that is consistent with our holding in *Texas Disposal I*. *See id.* at 582–83. Thus, not only was it not error

---

[5] "Leachate" is "[a] liquid that has passed through or emerged from solid waste." *See* Tex. Admin. Code § 330.3(78) (2012) (Texas Commission on Environmental Quality, Definitions).

for the district court to submit this question and instruction to the jury, the district court was bound

to do so under the law of the case. *See Texas Parks & Wildlife Dep't v. Dearing*, 240 S.W.3d 330,

347 (Tex. App.—Austin 2007, pet. denied) (discussing law-of-the-case doctrine and holding that

trial court abuses its discretion if it fails to carry out mandate of appellate decision). Likewise,

absent rare circumstances that are not evident here, we are bound by our initial decision that the

district court erred when it failed to submit to the jury the requested jury question and instructions

regarding defamation per se. *See Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003);

*Dearing*, 240 S.W.3d at 348 ("Under the law-of-the-case doctrine, a court of appeals is ordinarily

bound by its initial decision on a question of law if there is a subsequent appeal in the same case.")

(citing *Briscoe*, 102 S.W.3d at 716).

But even if the question and instructions submitted to the jury on retrial had not

tracked the question and instruction we reviewed and approved in *Texas Disposal I*, the submitted

question and instruction properly asked the jury to resolve the ambiguities that existed regarding

the meaning and effect of the statements and implications in the Action Alert. *See id.* at 582–83.

Specifically, the submitted question and instructions asked the jury to determine whether the

statements, looked at from an ordinary person's perception of the statement or implication in

the context of the Action Alert as a whole and in light of the surrounding circumstances, affected

Texas Disposal's "business, occupation, or office, or charge [Texas Disposal] with illegal or immoral

conduct." *See Musser*, 723 S.W.2d at 655 (holding that fact question about meaning and effect of

words may be passed to jury); *Restatement (Second) Torts* § 614(2) (1977) (providing that "jury

determines whether a communication, capable of a defamatory meaning, was so understood by

its recipient"). In other words, the jury here was asked to determine both whether the defamatory

12

statements in the Action Alert affected Texas Disposal's business as described and also whether an ordinary person under the circumstances would have understood it to have that effect. Again, allowing the jury to answer what would ordinarily be a legal question is proper where, as here, there are underlying ambiguities that require resolution. *See Musser*, 723 S.W.2d at 655; *Texas Disposal I*, 219 S.W.3d at 581.

Waste Management contends that it was improper to submit this question to the jury because "statements must be defamatory per se as a matter of law." Specifically, Waste Management contends that to be defamatory per se, the trial court must determine as a matter of law that the statements are (1) immediately and obviously harmful based on common experience, (2) without resorting to extrinsic evidence, and (3) when viewed as a whole. But Waste Management cites to no authority for this three-part test, and we do not agree that it accurately states the law with regard to the facts of this case. We simply note this Court and several of our sister courts have deemed a statement that injures a person in his office, business, profession, or occupation as defamatory per se. *See, e.g.*, *Pitts & Collard, L.L.P. v. Schechter*, —S.W.3d—, 2011 WL 6938515 (Tex. App.—Houston [1st Dist.] 2011, no pet. h.); *Cullum v. White*, —S.W.3d—, 2011 WL 6202800 (Tex. App.—San Antonio 2011, pet. denied) ("Publications are 'libel per se if they include statements that (1) unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity, or (2) are falsehoods that injure one in his office, business, profession, or occupation.'" (quoting *Main v. Royall*, 348 S.W.3d 381, 390 (Tex. App.—Dallas 2011, no pet.)); *Morrill v. Cisek*, 226 S.W.3d 545, 549 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("Defamation is actionable per se if it injures a person in his office, business, profession, or occupation."); *Texas Disposal I*, 219 S.W.3d at 581. Likewise, section 573 and comment e to section 569 of the *Restatement*

13

*(Second) of Torts* classify statements affecting another's business, trade, profession, or office as defamatory per se. *See Restatement (Second) Torts* §§ 569 cmt. e, 573. Waste Management emphasizes, however, that the statements in the Action Alert are "dry and technical" and thus were not "immediately and obviously harmful based on common experience" because they are not "highly inflammatory language that imputes immoral or illegal conduct." But again, the relevant questions here are whether the statements in the Action Alert are defamatory—i.e., whether they tend "to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him," *see id.* § 559—and if so, whether the defamatory statements affect Texas Disposal's business, trade, profession or office, *id.* at §§ 569, 573.

Waste Management also argues that the statements in the Action Alert cannot be considered defamatory per se because they are not defamatory on their face, as shown by the fact that Texas Disposal had to produce extrinsic evidence or innuendo to show the statements were defamatory. But even assuming without deciding that Waste Management's premise here is correct, we disagree that extrinsic evidence was necessary to show the statements' defamatory nature or, in fact, that Texas Disposal produced evidence for that purpose. First, the defamatory nature of the statements is apparent from the face of the Action Alert, which asserts that Texas Disposal operated its landfill as an exception to EPA rules, did not have a required leachate collection system, and accepted harmful or dangerous waste other than hazardous waste at its landfill. Each of these statements plainly implies that Texas Disposal's landfill was dangerous or environmentally inferior.[6] Second, it appears that the purpose of Texas Disposal's evidence was to establish the falsity of

---

[6] The specific EPA rule referred to here is found at 40 C.F.R. § 258.40 (1997) (EPA Design Criteria for Municipal Solid Waste Landfills).

14

these statements and implications and to show that Waste Management made the statements with actual malice.

Finally, Waste Management argues that it was error for the district court to ask the jury about "isolated" sections of the Action Alert because Texas law requires the statement be "viewed as a whole." *See, e.g.*, *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000) ("We have long held that an allegedly defamatory publication should be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it.") In making this argument, Waste Management suggests that the jury charge here lifts the relevant sentences or phrases out of context and thus reduces the jury to "microscopic wordsmithing, rather than requiring their consideration of the Action Alert taken as a whole." We disagree. The Action Alert itself was an exhibit available to the jury, and the charge clearly, plainly, and frequently directs the jury to consider the Action Alert's implications and statements "as a whole" and "in light of the surrounding circumstances." Further, the defamatory-per-se question instructs the jury to consider "an ordinary person's perception of the statement or implication in the context of the Action Alert as a whole, and in light of the surrounding circumstances." Thus, the jury did not consider only isolated portions of the Action Alert. We overrule Waste Management's second issue on appeal.

**Business disparagement**

In its third issue, Waste Management argues that the district court erred in entering judgment for Texas Disposal because Texas Disposal had "abandoned any claim for business disparagement that might have supported the damages it sought and obtained." In making this argument, Waste Management relies on its related assertion, which it urged in its second issue but

which we address here, that only a natural person can maintain a defamation cause of action. Specifically, Waste Management argues that it was error for the district court to submit the defamation-per-se question to the jury because a cause of action for defamation is available only to natural persons, not to corporations such as Texas Disposal. Therefore, Waste Management asserts, because Texas Disposal abandoned its business disparagement claim, Texas Disposal has no way to recover the damages it seeks to recover here. But Waste Management cites no persuasive authority for this proposition, and the Texas Supreme Court has specifically "recognized that a corporation, as distinguished from a business, may be libeled." *See General Motors Acceptance Corp. v. Howard*, 487 S.W.2d 708, 712 (Tex. 1972) (citing *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890 (Tex. 1960); *Bell Publ'g Co. v. Garrett Eng'g Co.*, 170 S.W.2d 197 (Tex. 1943)); *see also Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1328 n.3 (5th Cir. 1993) (interpreting Texas law to allow a corporation to bring a cause of action for libel) (citing *Brown v. Petrolite Corp.*, 965 F.2d 38, 43 n.5 (5th Cir. 1992); *Howard*, 487 S.W.2d at 712); *Spincic v. Haber*, No. B14-87-00569-CV, 1988 WL 34894, at *4 (Tex. App.—Houston [14th Dist.] Apr. 14, 1988, no writ) (mem. op., not designated for publication) ("A defamation action lies on behalf of a corporation just as on behalf of an individual.") (citing *Howard*, 487 S.W.2d at 708); *Restatement (Second) of Torts* § 561 ("One who publishes defamatory matter concerning a corporation is subject to liability to it . . . if the corporation is one for profit, and the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it . . . ."); *id.* at cmt. b ("A corporation for profit has a business reputation and may therefore be defamed in this respect."). Accordingly, Waste Management's argument here is without merit and we overrule its third issue on appeal.

**Actual Malice**

In its fourth issue, Waste Management asserts that there is insufficient evidence to uphold the jury's finding that Waste Management published the alleged defamatory statements or implications in the Action Alert with actual malice. In *Texas Disposal I*, Waste Management raised, and we rejected, the same argument, although stated more broadly. *See* 219 S.W.3d at 574–75 (rejecting Waste Management's argument that the take-nothing judgment should be affirmed because there was not clear and convincing evidence of actual malice). Here, Waste Management specifically urges that there is insufficient evidence of actual malice because (1) "technical inaccuracies or rephrasings in matters of engineering and regulatory jargon are not sufficient to show falsity," (2) "the statements in the Action Alert, at worst, are no more than an understandable misinterpretation of ambiguous facts, which is insufficient to show actual malice as a matter of law," and (3) Waste Management's agents "had a rational basis for believing the truth of the statements."

We have reviewed the evidence in this case and determined that it is essentially the same evidence that was presented in the first trial, which we reviewed in our analysis of the evidence supporting that first jury's finding of actual malice as asserted by Waste Management in its cross-appeal in *Texas Disposal I*. *See* 219 S.W.3d at 574–80. Although the first jury was asked about the Action Alert in general terms—i.e., "Was the Action Alert false as it related to [Texas Disposal]?" and "At the time the Action Alert was published, did [Waste Management] know it was false or have serious doubts about its truth?"—and the second jury was asked separate questions about discrete parts of the Action Alert—e.g., whether the implication from the Action Alert that Texas Disposal does not have a leachate collection system was false when made and, if false, whether

17

Waste Management made the statement knowing it was false or with reckless disregard to its falsity—our opinion in *Texas Disposal I* reviews that section of the Action Alert which served as the basis for the discrete questions presented in the retrial. Thus, to the extent that Waste Management's challenge here to the evidence supporting actual malice overlaps our recitation of the standard of review and our evidentiary analysis in *Texas Disposal I*, we adopt here that standard of review and analysis as appropriate to our review of this case. *See id.* (holding that the record contained clear and convincing evidence that when Waste Management published the Action Alert, at a minimum it had serious doubts about the Action Alert's accuracy); *see also* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to a final disposition of the appeal."). We will, however, address the additional issues raised by Waste Management in this appeal that were not addressed in *Texas Disposal I. See* Tex. R. App. P. 47.1.

Waste Management first argues that the statements in the action alert are the type of "technical, scientific, and regulatory jargon that are legally insufficient to support a finding of actual malice." It references as examples the words "exception" versus "alternative," "leachate finger drains" versus "leachate blanket," and whether compacted *in situ* clays are less reliable than a composite liner, arguing that these are "technical and evaluative assessments that simply cannot lend themselves to a characterization of knowing falsity." Initially, we note that the applicable section of the Action Alert does not refer to "leachate finger drains" or to whether compacted *in situ* clays are less reliable than a composite:

> **Landfill Liner and Leachate Collection**: Unlike other landfills in the Travis County area, [Texas Disposal]'s landfill applied for and received an exception to the EPA Subtitle D environmental rules that require a continuous synthetic liner at the landfill

18

and a leachate collection system utilizing a leachate blanket to collect water that comes in contact with garbage (so that it cannot build up water pressure in a landfill). [Texas Disposal] requested and received state approval to use only existing clay soils as an approved "alternative liner" system, rather than use an expensive synthetic liner over the clay. Other landfills in Central Texas and San Antonio in similar clay formations are using the full synthetic liner in addition to the clay soils.

Nevertheless, in support of its argument, Waste Management relies on the Supreme Court's decision in *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485 (1984), which held that the imprecise language used in the publication at issue—specifically whether sound from speakers traveled "along the wall" versus "about the room"—did not support an inference of actual malice:

> The statement in this case represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies. [*Pape*,] 401 U.S., at 292. "Realistically, . . . some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in *New York Times*, *Butts*, *Gertz*, and similar cases to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material." *Herbert v. Lando*, 441 U.S. 153, 171–172 (1979). "[E]rroneous statement is inevitable in free debate, and . . . must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'" *New York Times*[], 376 U.S. at 271–272 (citation omitted).

*Id.* at 513. But unlike the underlying facts of *Bose Corp.*, there is evidence in this record that the language used was not merely inaccurate or made in error, but instead was known to be incorrect by the parties instrumental in drafting the Action Alert and was specifically chosen to be negative for Texas Disposal and to prevent San Antonio from awarding a contract to Texas Disposal. The principal author of the Action Alert, Don Martin, testified that he knew that Texas Disposal's landfill complied with EPA Subtitle D rules and knew that it would be false to say that Texas Disposal was not in compliance with Subtitle D, but that he intended the Action Alert to give the reader the impression that Texas Disposal had a "loophole" around those environmental rules such that it did

not comply. *See* 42 C.F.R. § 258.40 (setting forth EPA's design criteria for municipal solid-waste landfills). He also testified that the purpose of the Action Alert was to suggest to its readers that Texas Disposal's landfill was less environmentally safe. Likewise, Waste Management employees involved with Martin in drafting the Action Alert testified that they knew that Texas Disposal's landfill was in compliance with Subtitle D, that it was false to suggest that Texas Disposal operated its landfill under an exception to Subtitle D, that it was false to suggest that Subtitle D requires a continuous synthetic liner in order to be in compliance with Subtitle D, that it was false to say that Texas Disposal's landfill did not have a leachate collection system, and that it was false to say that Texas Disposal's landfill accepted everything except for hazardous waste. Thus, rather than constituting imprecise language reflecting a misconception of a technical issue, *see Bose*, 466 U.S. at 492, 513, the evidence here demonstrates that the concept was fully understood and that the language used was deliberately chosen to have a harmful effect on Texas Disposal.

Relatedly, Waste Management argues that the Action Alert merely expresses a difference of opinion regarding the safety and reliability of Texas Disposal's landfill and that differences of opinion cannot show actual malice. It relies, in part, on the Fifth Circuit's holding in *Peter Scalamandre & Sons, Inc. v. Kaufman*. *See* 113 F.3d 556, 562 (5th Cir. 1997) (holding that differences of opinion could not show actual malice). But again the evidence in this case demonstrates that the statements and implications expressed in the Action Alert were not different opinions as to disputed matters, but were statements and implications known to be false by people involved with the drafting of the Action Alert that were specifically intended to give the impression that Texas Disposal's landfill was less environmentally sound than other landfills.

20

Waste Management focuses its argument on its assertion that, even though Texas Disposal believes its landfill to be environmentally sound, other landfill engineers and regulators strongly disagree; thus, Waste Management asserts, the implication that Texas Disposal's landfill is less environmentally sound than other similarly situated landfills is simply opinion that cannot support actual malice. But the Action Alert falsely states that the Texas Disposal landfill operates as an *exception* to EPA rules requiring a synthetic liner and a leachate collection system, *see* 42 C.F.R. § 258.40, and that Texas Disposal is allowed to operate using only the clay soil under the landfill as an "alternate liner"—in other words, that Texas Disposal's landfill does not have a liner or leachate collection system—whereas other landfills in the area use a full synthetic liner under the same conditions. Likewise, the Action Alert falsely states that the Texas Disposal landfill accepts all trash except for hazardous waste. These are not opinions regarding the relative environmental soundness of the landfill, but rather factual assertions that Texas Disposal's landfill does not have the environmental safeguards that the EPA requires and that other landfills in similar situations use.

Waste Management also argues that "the statements in the Action Alert are, at worst, a rational and understandable interpretation of regulations and technical manuals that 'bristle with ambiguities' and require specialized technological knowledge to identify as true [or] false." *See Time Inc. v. Pape*, 401 U.S. 279, 290 (1971) (referencing a document that "bristled with ambiguities"). Specifically, Waste Management argues that "whether one characterizes the [Texas Disposal] landfill as an 'exception' or as an 'alternative' is the type of semantic choice of words that is legally insufficient to support a finding of knowing falsity." But several Waste Management employees who participated in the drafting of the Action Alert, and its principal author,

21

Martin, testified that when the memo was drafted, they understood that there were two ways to comply with Subtitle D—i.e., either a performance-based design or a composite liner—and that they knew that Texas Disposal's so-designated "alternative design" was in compliance with Subtitle D. Likewise, they stated that they knew that Texas Disposal's landfill had a leachate collection system and that Subtitle D did not require a continuous synthetic liner. This knowledge, coupled with the principal author's testimony that the intent behind using the word "exception" in the Action Alert was to convey the message that Texas Disposal's landfill was not in compliance with Subtitle D, belies Waste Management's argument here that Subtitle D "bristles with ambiguities," at least with regard to this particular statement, and that use of the word "exception" is a "rational and understandable interpretation" of Subtitle D. Instead, it suggests, as the jury found, that it was a deliberate mischaracterization of the Texas Disposal landfill's compliance with EPA rules. We further emphasize that, as complicated and technical as EPA rules may be, it is clear from the text of Subtitle D that there are two acceptable designs and that neither of the two designs are "exceptions" to the design rules:

> (a) New MSWLF units and lateral expansions shall be constructed:
>
> (1) In accordance with a design approved by the Director of an approved State or as specified in §258.40(e) for unapproved States. The design must ensure that the concentration values listed in Table 1 of this section will not be exceeded in the uppermost aquifer at the relevant point of compliance, as specified by the Director of an approved State under paragraph (d) of this section, or
>
> (2) With a composite liner, as defined in paragraph (b) of this section and a leachate collection system that is designed and constructed to maintain less than a 30-cm depth of leachate over the liner.

EPA Design Criteria for Municipal Solid Waste Landfills, 40 C.F.R. § 258.40 (1997).

22

Finally, Waste Management argues that the evidence was legally insufficient to find actual malice because the principal author of the Action Alert testified to his "honest belief in the accuracy of the Action Alert's statements at the time of publication and because the statements in the Action Alert have rational support in the known facts." But as we explained in *Texas Disposal I*, "[b]ased on the jury's affirmative answers to falsity and actual malice, the jury must have disbelieved these self-serving statements. As long as that determination was reasonable, we too should ignore this evidence." *Texas Disposal I*, 209 S.W.3d at 577 (citing *Bentley*, 94 S.W.3d at 599). *Texas Disposal I* then went on to examine the evidence supporting the jury's finding of falsity and actual malice, concluding that it was clear and convincing. *Id.* at 579. Based on essentially the same evidence and analysis we relied on in *Texas Disposal I*, *see id*. at 577–80, specifically the fact that Waste Management's consultant, the principal author of the Action Alert, and at least some of the Waste Management employees involved in drafting the Action Alert knew at the time that certain of the statements were false, we again conclude that there is clear and convincing evidence in the record that when Waste Management published the Action Alert, it had, at a minimum, serious doubts about its accuracy.

We overrule Waste Management's fourth issue.

**Sufficiency of the evidence**

In its fifth issue, Waste Management brings legal- and factual-sufficiency challenges on the following grounds: (1) the evidence supporting the jury's $5 million injury-to-reputation award is legally insufficient because there is no evidence that the Action Alert caused any injury to Texas Disposal; (2) the evidence supporting the jury's finding of falsity is legally and factually insufficient because the Action Alert was substantially true as a matter of law; (3) there is no

23

evidence to support causation because Texas Disposal failed to establish that Texas Disposal's reputation was injured, that it incurred remediation costs, or that there were not other causes for its damages; and (4) the evidence is legally and factually insufficient to support the level of common law or statutory malice for an award of exemplary damages.

### *Standard of review*

A party challenging the legal sufficiency of the evidence supporting an adverse finding on an issue for which an opposing party has the burden of proof will prevail if (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, (4) the evidence conclusively establishes the opposite of the vital fact. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995) (internal quotes omitted)). But if the evidence is so weak that it does no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

When conducting a legal-sufficiency review, we view the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller*, 168 S.W.3d at 807. We indulge every reasonable inference that would support the trial court's findings. *Id*.

24

at 822. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id*. at 827.

When an appellant attacks the factual sufficiency of an adverse finding on an issue on which he did not have the burden of proof, the appellant must demonstrate that the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). We review the factual sufficiency of the evidence to support a jury verdict by considering and weighing all the evidence in a neutral light, and we will set the verdict aside "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Id.* at 176. However, this Court is not a fact finder, and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

### *Injury to reputation*

Waste Management asserts that the jury's award of $5 million for reputation damages is not supported by legally sufficient evidence because there is "[no] evidence that publication of the Action Alert caused the claimed damages." Specifically, Waste Management complains that "[n]o witness identified a single customer that [Texas Disposal] lost or a single adverse act taken against [Texas Disposal]." It also suggests that, to be entitled to reputation damages, Texas Disposal would have had to elicit testimony, for example, that a person's impression of Texas Disposal was actually diminished by the publication of the Action Alert. In support of its argument that the jury's finding must be supported by evidence that the publication caused the claimed damages, Waste Management

25

relies on the Texas Supreme Court's decisions in *Bentley*, 94 S.W.3d at 605–06, and *Saenz v. Fidelity & Guaranty Insurance Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996).

In *Bentley*, the Texas Supreme Court held that the First Amendment requires appellate review of amounts awarded for mental-anguish and reputation damages in defamation cases "to ensure that any recovery only compensates the plaintiff for actual injuries and is not a disguised disapproval of the defendant." *See Bentley*, 94 S.W.3d at 605 (discussing non-economic award to person in defamation per se case). But in addressing the defendant's initial argument regarding whether an award of reputation damages was supported by the evidence, the *Bentley* court rejected the defendant's argument that the evidence did not support any award of reputation damages, holding that "[o]ur law presumes that statements that are defamatory per se injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation." *Id.* at 604. Thus, in the present case, we presume that publication of the Action Alert injured Texas Disposal's reputation, based on the jury's finding that the Action Alert was defamatory per se.

Beyond that presumption, however, we must still review the evidence to determine whether its supports the amount awarded for reputation damages. *See id*. at 605–06 (noting that the jury is bound by the evidence in awarding damages). Although the jury has some latitude and discretion in assessing reputation damages, there must be evidence in the record that $5 million is fair and reasonable compensation for the injury to Texas Disposal's reputation. *See id.*

In this case, Texas Disposal's president Bob Gregory testified that publication of the Action Alert injured Texas Disposal's reputation in the amount of $10 million. In support of that amount, he explained why it was important for a business like Texas Disposal to have a good reputation, what a good reputation is worth to a company, which he characterized as "priceless," and

specifically why it was important for Texas Disposal to have a good environmental reputation, pointing out specific examples of environmental-reputation problems in Austin. He stated that, before publication of the Action Alert, Texas Disposal had a good reputation in the central Texas community, and Austin in particular, for running an environmentally sensitive or sound landfill. He then described his impression of the environmental community's reaction to the Action Alert, including reports that some of its members had "turned a cold shoulder" to Texas Disposal after the Action Alert, and that Texas Disposal appeared to be, at the very least, no different from other landfills. Gregory also provided financial information about Texas Disposal, including information about the dollar amounts of its contracts that Texas Disposal claimed were put at risk by publication of the Action Alert. Finally, he described in detail the actions he and his company had to take to counteract or remedy the damage to its reputation. In addition to Gregory, the jury heard testimony from Austin community members and environmentalists about their concerns when the Action Alert was published. Finally, the jury heard testimony about Waste Management's purpose in publishing the Action Alert—to give the impression that Texas Disposal's landfill was less environmentally sound and to have an adverse effect on Texas Disposal in general.

Taking all the evidence into consideration, we cannot say that the jury's award of $5 million in reputation damages was excessive or unreasonable. Further, given that the jury rejected part of Texas Disposal's request for its costs and expenses and all of its claim for lost profits, and that it reduced Gregory's estimate of $10 million in reputation damages to $5 million, the jury's award here does not appear to be "disguised disapproval" of Waste Management. *See id.* at 605 (requiring evidentiary review of exemplary damages to ensure that award is not jury's "disguised disapproval of the defendant").

27

*Falsity*

In its second evidentiary-sufficiency argument, Waste Management asserts that the "evidence on falsity is insufficient because the Action Alert was substantially true as a matter of law, or is protected as non-actionable opinion." Specifically, Waste Management asserts that "the 'gist or sting' of statements in the Action Alert is the same or less harmful than the true facts, when taken as a whole and as understood by a reasonable reader of ordinary intelligence." *See Turner*, 38 S.W.3d at 115 (noting that "the substantial truth doctrine precludes liability for a publication that correctly conveys a story's 'gist' or 'sting' although erring in the details). We disagree.

The "gist" or "sting" of the Action Alert is that Texas Disposal's landfill is environmentally unsound and less protective than other landfills, including Waste Management's competing landfill, because it uses an "alternative liner" system through an "exception" to EPA rules, whereas "other landfills" use the "require[d] . . . continuous synthetic liner . . . and a leachate collection system . . . ." *See Texas Disposal I*, 219 S.W.3d at 577. The truth, as we discussed in *Texas Disposal I* and as demonstrated by the evidence in the record here, is that Texas Disposal's landfill does not operate under an exception to EPA rules, but rather uses a performance-design method that is designed in part to complement the environment in which it operates and that is one of two methods specifically allowed or sanctioned under Subtitle D rules. *See* 40 C.F.R. § 258.10(a). The evidence also shows that the performance-design method is, under EPA rules, environmentally equal to the other method allowed under EPA rules, which requires a continuous synthetic liner. *See id.* Further, the evidence shows that Texas Disposal's landfill was approved and licensed by the

28

Texas Natural Resource Conservation Commission (TNRCC),[7] and that the landfill's location in a "low permeability" clay formation gives it some environmental advantages over other landfills. Accordingly, Waste Management's argument that the "gist" or "sting" of the statements in the Action Alert are not less harmful than the true facts falls flat.

Waste Management argues that characterizing Texas Disposal's compliance with EPA rules as an "exception" is both literally and substantially true because Texas Disposal was allowed to construct its landfill without a continuous synthetic liner and leachate-collection system utilizing a leachate blanket. Specifically, it asserts that the "so-called performance design" method in section (a)(1) of Subtitle D is an exception to section (a)(2), which requires a design that includes both a synthetic liner and continuous leachate collection system, and that the jury should have been asked "if it was false to say that [Texas Disposal] received an exception to 'the EPA Subtitle D environmental rules that require a continuous synthetic liner at the landfill and a leachate collection system utilizing a leachate blanket to collect water that comes in contact with garbage (so that it cannot build up water pressure in landfill).'" But that construction makes no sense. The evidence establishes, and the plain language of Subtitle D shows, that there are two methods of compliance—one is the performance-design method, which may include or not include any of these systems depending on the site, and the other is the "general" or "default" method that has specified

_____

[7] The TNRCC, or Texas Natural Resource Conservation Commission, was the administrative agency charged with the statutory authority to issue solid-waste permits between 1993 and 2004. The Legislature changed TNRCC's name to the Texas Commission on Environmental Quality in 2001, to be fully effective as of January 1, 2001. *See* Act of May 28, 2001, 77th Leg., R.S., ch. 965, § 18.01, 2001 Tex. Gen. Laws 1933, 1985; *See also* Act of July 25, 1991, 72d Leg., 1st C.S., ch. 3, § 1.058, 1991 Tex. Gen. Laws 4, 20 (changing name from the Texas Water Commission to the TNRCC); TCEQ History, http://www.tceq.texas.gov /about/tceqhistory.html (last visited April 23, 2011).

requirements regardless of the site. Operation under either of these methods is within the Subtitle D rules. If something is included within a rule, compliance with it cannot be said to be an exception. *See Black's Law Dictionary* 644 (defining exception as "[s]omething that is excluded from a rule's operation").

Also in support of this argument, Waste Management complains that the jury question regarding the Action Alert's "exception" statement was taken out of context. It points to evidence showing that (1) 95% of the landfills in the country use a composite liner design; (2) none of the expert engineers "had ever seen any other solid waste landfill lacking both a synthetic liner and utilizing only 'finger drains'"; (3) the designer of Texas Disposal's leachate collection system has never designed another landfill using the same system; and (4) TNRCC's 1997 list of alternate liner designs showed only two other landfills using *in situ* clays with no synthetic liner and no other landfills relying only on leachate drains. But while this evidence may show that Texas Disposal's leachate system is not commonly used in other landfills, it does not inform the issue of whether Texas Disposal's leachate system is an "exception" to EPA rules. That inquiry is informed by provisions of the EPA rule itself, which as discussed above, provides two alternate, but equally authorized under the rule, methods for design compliance. *See* 40 C.F.R. § 258.40(a). And the evidence in the record here shows that Texas Disposal's landfill design complied with this EPA rule. Accordingly, the Action Alert's statement that Texas Disposal's landfill was an exception to EPA rules is not substantially true. In fact, based on the evidence and the jury's finding, it is false.

Likewise, the district court did not, as Waste Management maintains, "erroneously truncat[e] parts of the Action Alert" in its questions to the jury. As set forth fully above, the jury was asked to answer whether the Action Alert's statement that Texas Disposal "applied for and received

30

an exception to the EPA subtitle D environmental rules" was false when made. Although that question does not include the full sentence from the Action Alert, the jury was provided with a complete copy of the Action Alert and was instructed in the jury charge "to consider an ordinary person's perception of the statement or implication *taken as a whole*," and "construed in light of the surrounding circumstances and based upon how a person of ordinary intelligence would understand the *entire* statement or implication." (Emphasis added.)

Relatedly, Waste Management argues that the statement in the Action Alert that "There are no restrictions on the types of waste that may be disposed of at the [Texas Disposal] landfill, with the exception of hazardous waste," is substantially true because the Texas Disposal landfill cannot take hazardous waste and because the statement is "exactly the same as the sign posted at the entrance to the [Texas Disposal] facility." Initially, we note that the evidence shows that the sign at the Texas Disposal facility does not state that there are no restrictions on the types of waste that the landfill may accept, nor does the sign suggest that hazardous waste is the only type of waste that the facility may not accept. Instead, the sign provides that—

**NO HAZARDOUS WASTE ACCEPTED**

Non-hazardous special waste drums sludge and liquids
will also be refused or returned at haulers expense
unless previously approved by management in writing.

(Graphics omitted.) A plain reading of this sign suggests at least two reasonable interpretations: (1) the landfill does not accept hazardous waste, or (2) the landfill does not accept hazardous waste and certain other types of non-hazardous waste. This sign does not, however, support Waste Management's suggestion that, outside of hazardous waste, there are no restrictions on the

31

type of waste that may be disposed of at the landfill. Regardless, the evidence in the record supports the jury's finding that this statement in the Action Alert is false. Witnesses at trial testified that, in addition to hazardous waste, the landfill did not accept, and could not accept pursuant to the terms of its license, radioactive waste, class 1 nonhazardous industrial waste, sludge, bulk liquids, automobile parts, tires, certain types of contaminated soil, used oil, and untreated medical waste. Further, the author of the Action Alert testified that he was familiar with the technical definition of "hazardous waste." Accordingly, the evidence is both legally and factually sufficient to support the jury's finding that the statement is false.

Waste Management also proclaims the truthfulness of the Action Alert statement that "other landfills in Central Texas and San Antonio in similar clay formations are using the full synthetic liners in addition to the clay soils." Specifically, Waste Management argues that of the ten surveyed landfills, one had closed and the others had amended their permits to include composite liners and, Waste Management argues, "[t]he fact that other landfills had grandfathered sections, allowing them to finish filling out pre-Subtitle D liners, is precisely the kind of secondary detail that the law treats as inconsequential." But again, there is legally and factually sufficient evidence to support the jury's finding that this statement was false when it was made. Waste Management's witness Loren Alexander testified that a "full synthetic liner" is a liner that covers the "entire bottom of the landfill." In response to the question, "were any landfills in Travis County using full synthetic liners as of the date of the Action Alert," Alexander responded, "No." Further, Alexander and Robert Drenth, a former regional vice president of Waste Management, testified that, as of the date of the Action Alert, Waste Management's Williamson County landfill did not have a synthetic liner and its Austin and Comal County landfills did not have full synthetic liners.

32

Waste Management also takes issue with the jury's finding regarding the Action Alert's "implication that Texas Disposal's landfill does not have a leachate collection system." First, Waste Management asserts that the jury question does not properly reflect what the Action Alert actually says and, second, that what the Action Alert does state is substantially true because the landfill does not have a continuous leachate-blanket system. As set forth above, the Action Alert statement provides that, "Unlike other landfills in the Travis County area, [Texas Disposal]'s landfill applied for and received an exception to the EPA Subtitle D environmental rules that require a continuous synthetic liner at the landfill and a leachate collection system . . . ." The clear import of this statement is that, having been granted an exception to the EPA rule requiring a continuous synthetic liner *and* a leachate collection system, the Texas Disposal landfill has neither a continuous synthetic liner nor a leachate collection system. Further, Waste Management's regional vice president at time of the Action Alert acknowledged on cross-examination that the statement implies that Texas Disposal's landfill does not have a leachate collection system. Thus, a jury question asking about the implication of this statement—i.e., that Texas Disposal's landfill did not have a leachate collection system—was proper.

The jury found that the Action Alert's implication regarding a leachate collection system was false, and the evidence supports that finding. Texas Disposal's witness Doctor Robert Kier, testifying as an expert in hydrogeology, testified that Texas Disposal's landfill has a leachate collection system, which he defined as "an engineered system to collect leachate that accumulates on the bottom or sides of a landfill" to prevent the leachate from migrating into the groundwater. He further testified that it would be false to characterize Texas Disposal's landfill as not having a leachate collection system. Engineer Pierce Chandler, who designed the Texas Disposal

33

landfill's leachate-collection system in 1994, testified that he considered the system that he designed for the landfill—a system of interconnected drains—to be a leachate collection system and providing a detailed description of the system in support of that conclusion. Likewise, there is documentary evidence in the record, including a letter from TNRCC, that refers to the landfill's leachate collection system. Conversely, there is nothing in the record to suggest that Texas Disposal's landfill does not have a leachate collection system.

Finally, Waste Management argues that the jury's finding that the Action Alert contains an implication that Texas Disposal's landfill is environmentally less protective than other area landfills is "erroneous" for two reasons: (1) the jury charge misstates what the Action Alert actually says; and (2) "less protective" is an opinion rather than a fact. Initially, we note that the Action Alert makes the following assertions regarding the environmental aspects of Texas Disposal's landfill: it has no restrictions on the type of non-hazardous waste it will accept, it operates under an exception to EPA regulations requiring a continuous synthetic liner or leachate collection system, it uses only the clay soil under the landfill as an "alternative liner" system rather than an expensive synthetic liner over the clay, and it is unlike the other landfills in the area that use full synthetic liners. The Action Alert then provides contact information for those readers who have "environmental or traffic" concerns. The principal author of the Action Alert, Don Martin, testified that the purpose of the Action Alert was to show that Texas Disposal's landfill was "different," that it had an inferior design, and that it was less environmentally safe. Accordingly, the jury charge was proper. *See* Tex. R. Civ. P. 278 (requiring trial court to submit questions, instructions and definitions that are raised by the pleadings and evidence); *Elbaor v. Smith*, 845 S.W.2d 240, 234

34

(Tex. 1993) (citing rule 278 for the proposition that trial courts must submit requested questions to the jury if the pleadings and evidence support them).

Waste Management contends that, regardless of whether this jury question was proper, the "environmentally less protective" implication is merely an expression of opinion and not actionable fact. *See Gertz*, 418 U.S. at 339–40 (noting in dicta that "there is no such thing as a false idea"). Waste Management argues that the relative safety levels of different landfills are not objectively verifiable and there is no evidence in the record to support a conclusion to the contrary. But each of the cases on which Waste Management relies involve situations where the opinion is the publication.[8] In this case, the alleged opinion is inferred from the false statements in the Action Alert about Texas Disposal's landfill, and those statements are objectively verifiable. Stated another way, the implication of the false statements is that the landfill is less environmentally safe than other landfills. Regardless, however, the law provides that a statement is non-actionable opinion if it is not capable of being proved true or false. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20 (1990). In *Milkovich*, the Supreme Court noted that if a speaker of an alleged opinion states the facts upon which he bases the opinion, and those facts are either incorrect or incomplete or if his assessment of those facts is erroneous, the statement may still imply a false assertion of fact. *Id.* at 18–19. As set forth previously, Texas Disposal presented evidence that its landfill has restrictions

---

[8] *See Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 562 (5th Cir. 1997) (holding that statement that land application of sewer sludge is harmful to human health and the environment is opinion); *Robertson v. Southwestern Bell Yellow Pages, Inc.*, 190 S.W.3d 899, 902 (Tex. App.—Dallas 2006, no pet.) (holding that statement that plaintiff was "incompetent" is opinion); *MKC Energy Invs., Inc. v. Sheldon*, 182 S.W.3d 372, 378 (Tex. App.—Beaumont 2005, no pet.) (holding that statement that plaintiff's premises were "dangerous and unhealthy" is opinion); *Morris v. Blanchette*, 181 S.W.3d 422, 425 (Tex. App.—Waco 2005, no pet.) (holding that statement that doctor's surgical procedures were "totally unreasonable and substantially failed to meet the professional, recognized standards" is opinion).

35

on the type of non-hazardous waste it may accept, the landfill does not operate under an exception to EPA rules that require a continuous synthetic liner and leachate collection system, and the landfill has a leachate collection system that complies with EPA rules.

We conclude that there is evidence in the record to support the jury's finding of falsity. Further, considering all the evidence in the record, we cannot say that the jury's finding of falsity is so one-sided that it is clearly wrong or manifestly unjust. Accordingly, we hold that the evidence was legally and factually sufficient.

### *Causation*

In its third evidentiary-sufficiency argument, Waste Management contends that the evidence is insufficient to support causation because Texas Disposal failed to establish that the Action Alert caused Texas Disposal any new reputation damage or remediation damage and because Texas Disposal did not "negate alternate causes of damage it suffered." Regarding reputation, this is essentially the same argument that Waste Management makes regarding the legal sufficiency of the evidence supporting the jury's award of reputation damages—i.e., that there must be evidence that publication of the Action Alert caused damage to Texas Disposal's reputation—and for the same reasons, the argument here is also without merit: "Our law presumes that statements that are defamatory per se injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish." *Bentley*, 94 S.W.3d at 604; *See Gertz*, 418 U.S. at 349. Thus, because the jury found that the Action Alert is defamatory per se, Texas Disposal is presumed to have suffered damage and is entitled to some amount of damages. *See Bentley*, 94 S.W.3d at 604–05.

As to Waste Management's assertions regarding the evidence supporting remediation damages—i.e., that Texas Disposal failed to establish that its remediation expenses were caused by the publication of the Action Alert—Texas Disposal's witnesses testified that it incurred expenses in its attempts to remedy damages caused by the Action Alert. Specifically, Bob Gregory testified that Texas Disposal devoted staff time worth more than $700,000 in an effort to combat the Action Alert and that Texas Disposal had incurred actual out-of-pocket expenses of $450,592.02 for consultants it hired to combat the effects of the Action Alert. These consultant expenses were supported by documentary evidence in the form of billing invoices. We conclude that there is evidence to support the jury's finding that Texas Disposal suffered remediation damages. Further, considering all the evidence in the record, we cannot say that the jury's finding here is so one-sided that it is clearly wrong or manifestly unjust. Accordingly, we hold that the evidence was legally and factually sufficient.

### Exemplary damages

In its final evidentiary-sufficiency argument, Waste Management challenges the award of exemplary damages—$20 million awarded by the jury, reduced to $1.6 million by the district court's application of the statutory cap—arguing that the evidence was insufficient to support the jury's finding of common-law malice.

Under the applicable chapter 41 of the civil practice and remedies code,[9] a claimant may be awarded exemplary damages "only if the claimant proves by clear and convincing evidence

---

[9] As will be discussed in more detail in our analysis of Texas Disposal's single issue on appeal, the Legislature's 2003 amendments to chapter 41, *see* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 13.02–.09, 2003 Tex. Gen. Laws 847, 886–89, do not apply to this case, which was filed in 1997.

that the harm with respect to which the claimant seeks recovery of exemplary damages results from

. . . fraud [or] malice . . . ." *See* Former Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a). "Malice"

covers both intentional torts and gross negligence, and as to intentional torts, it means "a specific

intent by the defendant to cause substantial injury to the claimant." *See id.* at 109.[10]

In this case, there was evidence that Waste Management's specific purpose in

publishing the Action Alert was to harm Texas Disposal by preventing the consummation of an

almost-final contract with the City of San Antonio worth millions of dollars over the course of

several years. There was also evidence that Waste Management's specific purpose in publishing

the Action Alert was to adversely affect Texas Disposal's ability to procure a long-term contract

with the City of Austin for waste management services that was in the bidding stage when

Waste Management published the Action Alert, which meant that Texas Disposal could not contact

Austin city officials directly regarding any matter. Specifically, Martin, the consultant hired to draft

---

[10] Malice is defined as

(A)      a specific intent by the defendant to cause substantial injury or harm to the claimant; or

(B)      an act or omission

         (i)      which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

         (ii)      of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Act of Apr. 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109 (hereinafter "Former Tex. Civ. Prac. & Rem. Code).

the Action Alert, testified that he was told by Waste Management that the Action Alert needed to be done quickly to prevent the consummation of the San Antonio contract. He also testified that a purpose of the Action Alert was to make it appear that Texas Disposal's landfill was not in compliance with EPA regulations, that Texas Disposal had "some loophole around the Subtitle D regulations," and that the Texas Disposal landfill had an inferior design and was less environmentally safe than other landfills in central Texas. And to effect that purpose, he directed the publication of the Action Alert to San Antonio city officials and to the Austin environmental community. The Action Alert itself directs readers to contact San Antonio and Travis County officials with concerns or comments. Likewise, Waste Management's lobbyist Al Erwin testified that the purpose of the Action Alert was to raise questions about the environmental integrity of Texas Disposal's landfill. Thus, there is evidence in the record to support the jury's finding that Waste Management published the false statements or publications with the specific intent to cause Texas Disposal substantial harm.

Waste Management argues that the evidence supporting a finding of malice must show "much more than negligence, business competition, or even unethical behavior," citing for support the Texas Supreme Court's decision in *Qwest International Communications, Inc. v. AT&T Corp.*, 167 S.W.3d 324, 326–27 (Tex. 2005) (recognizing that "in a competitive global economy, time is often of the essence for businesses, jobs, and national productivity and prosperity. The Legislature's balance of such-competing interests requires courts to adhere to the standard that exemplary damages are available only if a corporation ignores an extreme risk of harm."). But *Qwest* principally involved whether the defendant was grossly negligent in laying cable rapidly and, as a result of the rapidity, repeatedly cutting AT&T's cables. *See id.* at 327. While the

supreme court also considered AT&T's argument that Qwest's policy showed a specific intent to cause substantial harm to AT&T—i.e., the common-law malice prong of the applicable definition—it rejected that argument because "a general corporate policy to work rapidly is insufficient (without more) to support exemplary damages." *See id.* at 326. In this case, unlike *Qwest*, there is more than a corporate policy to work rapidly or, for example, compete aggressively; there is evidence that Waste Management intended to substantially harm Texas Disposal. Accordingly, *Qwest* does not inform our decision here.

Waste Management also contends that there must be evidence that it engaged in "outrageous, malicious, or otherwise morally culpable conduct" and that the resulting harm is extraordinary, such as "death, grievous physical injury, or financial ruin." *See Rusty's Weigh Scales and Serv., Inc. v. North Tex. Scales, Inc.*, 314 S.W.3d 105, 112 (Tex. App.—El Paso 2010, no pet.) (quoting *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 16 (Tex. 1994) (noting that exemplary damages punish a defendant for "outrageous, malicious, or otherwise morally culpable conduct")); *Kinder Morgan N. Tex. Pipeline, L.P. v. Justiss*, 202 S.W.3d 427, 447 (Tex. App.—Texarkana 2006, no pet.). But *Rusty's* incorrectly suggests that a claimant must show both common law malice *and* gross negligence to prove malice under the civil practice and remedies code, and importantly, its discussion of "death, grievous physical injury, or financial ruin" is done in the context of a discussion of gross negligence rather than common-law malice. *See Rusty's*, 314 S.W.3d at 112; *see also* Former Tex. Prac. & Rem. Code Ann. § 41.001(7) (defining malice as specific intent to cause substantial harm or gross negligence). Likewise, *Moriel* and *Kinder Morgan* involve analyses of what evidence is required to support a finding of gross negligence—i.e., that the defendant acted with an extreme degree of known risk in conscious indifference to the rights, safety, or welfare

of others—rather than an analysis of common law malice. *See Moriel*, 879 S.W.2d at 19–21 (discussing the statutory definition of gross negligence); *Kinder Morgan*, 202 S.W.3d at 447 (setting forth the gross-negligence prong of the applicable definition of malice). Thus, these cases do not inform our decision here either.

In sum, to be eligible to recover exemplary damages in this case, the civil practice and remedies code required Texas Disposal to show that Waste Management acted with malice, which under the applicable definition of malice could be either common-law malice or gross negligence. As discussed above, there is evidence in this case to support the jury's finding that Waste Management acted with specific intent to cause substantial harm to Texas Disposal—i.e., common-law malice. Further, considering all the evidence in the record, we cannot say that the jury's finding of actual malice is so one-sided that it is clearly wrong or manifestly unjust. Accordingly, we hold that the evidence was legally and factually sufficient and overrule Waste Management's fifth issue.

## Exclusion of evidence

In its sixth issue, Waste Management asserts that the district court erred in excluding on hearsay grounds four TNRCC documents regarding Texas Disposal's solid-waste permit, including two letters from TNRCC to Texas Disposal (Exhibits 13 and 14) and two TNRCC interoffice memos (Exhibits 18 and 22). Waste Management argues that the district court's decision to sustain Texas Disposal's hearsay objection and exclude these exhibits was error because rule 803(8) of the Texas Rules of Evidence provides a hearsay exception for "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies setting forth . . . the activities of the office or agency." *See* Tex. R. Evid. 803(8)(A). We disagree.

41

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) (per curiam). A trial court abuses its discretion if it acts arbitrarily or unreasonably or without reference to any guiding rules and principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam) (citing *Downer v. Aquamarine Operators, Inc.*, 791 S.W.2d 238, 241–42 (Tex. 1985)). We may not reverse simply because we disagree with the trial court's decision; rather we may reverse only if the trial court acted in an arbitrary or unreasonable manner. *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991) (citing *Downer*, 791 S.W.2d at 242). Further, even if the trial court abused its discretion in admitting or excluding the evidence, reversal is warranted "only if the error probably caused the rendition of an improper judgment." *See Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *see also* Tex. R. App. P. 44.1(a)(1). "We review the entire record, and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted." *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). "Thus, if erroneously admitted or excluded evidence was crucial to a key issue, the error was likely harmful." *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008). "By contrast, admission or exclusion is likely harmless if the evidence was cumulative, or if the rest of the evidence was so one-sided that the error likely made no difference." *Id.*

Initially, we note that Waste Management does not provide any support for its assertion that the district court abused its discretion by excluding the evidence as hearsay. Instead, its briefing on this issue is limited to why the excluded evidence was relevant to this case and how the exclusion prejudiced Waste Management. An appellant who fails to adequately brief an issue waives that issue. *See* Tex. R. App. P. 38(i) (requiring appellate briefs to "contain a clear and

concise argument for the contentions made"); *Divine v. Dallas Cnty.*, 130 S.W.3d 512, 513–14 (Tex. App.—Dallas 2004, no pet.); *see also General Servs. Comm'n v. Little-Tex. Insulation Co., Inc.*, 39 S.W.3d 591, 598 n.1 (Tex. 2001) (holding that issue not properly briefed was not before the court). Nevertheless, we will address the merits of this issue, beginning with some background information about the exhibits.

During the summer of 1993, Texas Disposal asked TNRCC to modify its existing permit to allow it to use an "in situ alternate liner design" in its landfill. During the permitting process, the TNRCC staff generated letters and internal memoranda regarding Texas Disposal's modification request. Exhibit 13 is a November 24, 1993, letter to Texas Disposal regarding TNRCC's review of the alternate-liner-design information Texas Disposal had included with its modification request.[11] Among other matters, the letter recommends that Texas Disposal incorporate "a leachate collection system . . . into the alternate liner design demonstration." Exhibit 14 is a TNRCC letter dated April 29, 1994, notifying Texas Disposal that, based on TNRCC's preliminary review of the alternate-liner documents submitted with Texas Disposal's modification request, TNRCC was "disapprov[ing]" Texas Disposal's alternate liner design. Exhibit 18 is a September 7, 1994 TNRCC interoffice memorandum regarding its Municipal Solid Waste Division's review of Texas Disposal's alternate liner design proposal. In that memo, the author recommends to the TNRCC deputy executive director that TNRCC require Texas Disposal to install a leachate

---

[11] Exhibit 13 is actually dated November 24, 1998, but that date appears to have been stamped on the letter after it was generated and other evidence in the record refers to a similar letter dated November 24, 1993. Further, TNRCC ultimately approved Texas Disposal's modification request by November 16, 1994—i.e., well prior to 1998. Accordingly, because it does not appear to affect the resolution of this issue, we will assume that the correct date for Exhibit 13 is November 24, 1993.

collection system. Exhibit 22 is a November 9, 1994 TNRCC interoffice memo from three TNRCC engineers to Ron Pedde, also a TNRCC engineer, regarding their "opinion" of Texas Disposal's alternate liner design system and its compliance with Subtitle D. In the memo, the engineers state that they "cannot recommend approval of the proposed alternate liner design." TNRCC ultimately approved Texas Disposal's alternate liner design system on November 16, 1994.

According to its offer of proof, Waste Management considered these documents to be expert opinion testimony of TNRCC engineers showing "that the engineers tasked with enforcing Subtitle D did not believe at the time that [Texas Disposal] had actually complied with Subtitle D, that they hadn't met the standards." Waste Management argued that the exhibits were relevant to issues regarding truth, causation, damages, and malice. In deciding to exclude the evidence, the district court ruled that the statements in these documents—

> are relevant to whether or not the [Texas Disposal landfill] system is protective or is as protective, whether or not it complies with Subtitle D, . . . but it's hearsay. And it doesn't fall into the exception for public record given that this is expert opinion. If anything, it's opinion testimony and only competent if it's expert opinion on a crucial ultimate issue here of truth. And I do not believe the public record exception was intended to cover or does cover those circumstances—or that circumstance whether you consider it based on the untrust—or the untrustworthiness aspect of that exception or otherwise.

Stated another way, the district court found that it should not admit these exhibits under the public-record exception to the hearsay rule because the court considered the documents' status as opinion testimony to render them untrustworthy, *see* Tex. R. Evid. 803(8) (providing that public records may be admitted as exception to hearsay rule "unless the sources of information or other circumstances indicate lack of trustworthiness"), or because the court determined that rule 803(8) did not cover expert opinion testimony of this type. Given the fact that, at the time the documents were

44

presented, the court had little or no information regarding the authors' qualifications to give the expert opinions set forth in the documents, *see id.* 702 (requiring expert witness to be qualified to give expert testimony "by knowledge, skill, experience, training, or education"), or regarding the reliability of the opinions, *see id.*; *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995), we cannot say that the district court abused its discretion by determining that the hearsay exceptions did not apply and excluding this evidence.

Further, even if we were to assume that the excluded evidence was admissible and the trial court erred in excluding it, it appears the information in these documents was cumulative of evidence that was admitted into the record. Specifically, Erwin testified that the TNRCC staff engineers did not believe that Texas Disposal's leachate collection system was sufficient and that they believed that leachate would leak into the groundwater. Erwin explained why the TNRCC staff engineers disapproved of Texas Disposal's system, including that computer modeling did not agree with Texas Disposal's information. Further, Ron Bond, a former TNRCC engineer and the author of exhibits 14 and 18, testified that he told someone at Waste Management that the TNRCC had concerns about leachate generation, sidewall leakage, and other matters at the Texas Disposal landfill. Thus, other evidence presented at trial showed that TNRCC staff had concerns regarding the landfill's ability to protect the environment. To this extent, the excluded evidence was cumulative and, as such, its exclusion was harmless. *See Sevcik*, 267 S.W.3d at 873. We overrule Waste Management's sixth issue.

## Exemplary Damages

In its final issue, Waste Management challenges the jury's exemplary damage award, asserting that it is grossly disproportionate to the alleged offense and, as a result, violates substantive

due process. An assessment of grossly excessive exemplary damages violates a party's substantive due process rights because it "'furthers no legitimate purpose and constitutes an arbitrary deprivation of property.'" *See Bennett v. Reynolds*, 315 S.W.3d 867, 873 (Tex. 2010) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)); *see also* U.S. Const. amend. XIV, § 1 ("nor shall any State deprive any person of life, liberty, or property, without due process of law"); *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 433 (2001) (holding that the Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor). Waste Management asserts that its conduct, which it contends could only have resulted in economic harm, "was not sufficiently egregious to warrant a $1.6 million punitive damages award."

In our de novo review of whether the exemplary damage award is unconstitutionally excessive, we must consider three guideposts adopted by the United States Supreme Court:

1. "the degree of reprehensibility of the defendant's misconduct";

2. "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award"; and

3. "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."

*Bennett*, 315 S.W.3d at 873 (quoting *Campbell*, 538 U.S. at 418) (referred to as the "*Gore* guideposts" in reference to the Supreme Court's decision in *BMW of North Am., Inc. v. Gore*, 517 U.S. 559 (1996), which introduced these factors).

The first *Gore* guidepost, which focuses on the reprehensibility of the conduct, is "the most important indicium of the reasonableness of a punitive damages award." *See Gore*, 517 U.S.

46

at 575.  In determining the degree of reprehensibility of the defendant's conduct, we are guided by five nonexclusive factors:  (1) whether the harm inflicted was physical rather than economic; (2) whether the tortious conduct showed "an indifference to or a reckless disregard for the health or safety of others"; (3) whether "the target of the conduct had financial vulnerability"; (4) whether "the conduct involved repeated actions," not just "an isolated incident"; and (5) whether the harm resulted from "intentional malice, trickery, or deceit," as opposed to "mere accident."  *See Bennett*, 315 S.W.3d at 874 (quoting *Campbell*, 538 U.S. at 419) (some internal quotes omitted).  The presence of any one of these factors may still not be enough to support an award of exemplary damages, and the absence of all of these factors renders the award suspect.  *Campbell*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576–77).

Given that this case involves no physical harm or danger to individuals, the first and second reprehensibility factors do not weigh in favor of an award of exemplary damages.  Likewise, the fourth factor, regarding whether the conduct involved "repeated actions" or an "isolated incident," would seem to weigh against an award of exemplary damages because Waste Management published only one Action Alert.

The remaining reprehensibility factors, however, appear to provide more support for an award of exemplary damages.  There is evidence in the record that Texas Disposal was financially vulnerable because, at the time the Action Alert was published, Texas Disposal was finalizing a long-term contract with the City of San Antonio that the Action Alert was intended to harm, and also because the Action Alert threatened Texas Disposal's existing relationship with the City of Austin and its contemporaneous efforts to bid and win another City of Austin contract.  Also, there was some evidence that the publication of the Action Alert was deliberately timed to coincide

47

with a restriction on Texas Disposal's ability to communicate with City of Austin officials that was in effect as part of the bidding process. While there is no evidence to suggest that Waste Management's publication of Action Alert "threaten[ed] financial ruin" for Texas Disposal, *see Bennett*, 315 S.W.3d at 878, the evidence did show that Waste Management deliberately targeted long-term contracts that represented millions of dollars for Texas Disposal over the next several years. Thus, although the evidence established that Texas Disposal was eventually able to consummate its contract with the City of San Antonio and continue its existing contractual relationship with the City of Austin, it was financially vulnerable, when Waste Management published the Action Alert, to the type of defamation in the Action Alert. Texas Disposal argues that the Action Alert put its business at risk and harmed its general relationship with the City of Austin. Thus, the financial-vulnerability factor appears to be neutral at best or, more likely, to weigh slightly in favor of an award of exemplary damages. Finally, the remaining reprehensibility factor—i.e., whether the harm resulted from "intentional malice, trickery, or deceit," as opposed to "mere accident"—also favors exemplary damages because, as discussed previously, the evidence established that Waste Management specifically intended to cause substantial harm to Texas Disposal. In sum, then, although a close question, the reprehensibility analysis in the second *Gore* guidepost weighs slightly in favor of an award of exemplary damages on the facts of this case.

Because the reprehensibility factors in this case do not conclusively support an award of exemplary damages here, our analysis of the propriety of the award here turns largely on Supreme Court's second *Gore* guidepost—i.e., the disparity between actual or potential and exemplary damages, or the "Supreme Court's ratio analysis." *See Bennet*, 315 S.W.3d at 877

48

(holding that because only malice factor was shown, "the Supreme Court's ratio analysis must be assiduously followed").

The United States Supreme Court has not formulated a "a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable" awards of exemplary damages, *see Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18–19 (1991), but it has warned that an award that exceeds a 4:1 ratio of exemplary to actual damages "may be close to the line . . . of constitutional impropriety." *See Campbell*, 538 U.S. at 425; *see also Bennett*, 315 S.W.3d at 877 n.47 (noting same and explaining that 4:1 ratio is derived from Anglo-American tradition of "imposing 'double, treble or quadruple damages to deter and punish'" (quoting *Campbell*, 538 U.S. at 425)). The Texas Supreme Court has applied this 4:1 ratio under circumstances similar to this case—i.e., where the reprehensibility factors did not conclusively favor exemplary damages, with the strongest being that the conduct was the result of intentional malice rather than mere accident—and determined that a 4.33 to 1 ratio exceeded constitutional limits. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex. 2006). On facts which it described as "not meaningfully distinguishable from those in *Gullo Motors*," the Texas Supreme Court determined that an exemplary to actual damage award of 47 to 1 was constitutionally excessive. *See Bennett*, 315 S.W.3d at 878. But unlike those cases, the ratio of exemplary damages to actual damages in this case is far below the 4:1 threshold the Supreme Court has flagged for our caution. Here, the jury awarded Texas Disposal $5,450,592.03 in actual damages and $20 million in exemplary damages, which results in a 3.66 to 1 ratio. But more importantly, after correctly applying the statutory cap on exemplary damages, an issue that we discuss in more detail below, the district court reduced the exemplary damages award to $1,651,184.06, resulting in an exemplary damage award that is

49

*one third* of the actual damages—i.e., 3/10 (.3) to 1 ratio or, stated more dramatically, one-tenth of the 4:1 ratio. This ratio does not trigger constitutional concerns. Further, the *Gore* analysis also considers the potential harm, and the evidence here established that Waste Management's Action Alert was intended to have an adverse effect on contracts worth tens of millions of dollars to Texas Disposal. Thus, the second *Gore* guidepost, which focuses on the disparity between the actual or potential harm and the punitive damages awarded, tips in Texas Disposal's favor.

The final *Gore* guidepost calls for a comparison between the exemplary damages awarded and the civil penalties that could have been imposed for comparable misconduct. *See Bennett*, 315 S.W.3d at 880 ("The final guidepost compares the exemplary damages with legislatively authorized civil sanctions."). There are, however, no civil penalties for the publication of defamatory statements. To the extent that, by analogy, the Legislature's exemplary damages cap constitutes "legislatively authorized civil sanctions," that analysis also supports the constitutionality of the damage award here. For example, federal courts in this situation have looked to whether the exemplary damages awarded comport with statutory caps on damages because damage caps "represent[] a legislative judgment similar to the imposition of a civil fine." *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1045 (9th Cir. 2003); *see also EEOC v. Federal Express Corp.*, 513 F.3d 360, 378 (4th Cir. 2008) (noting that exemplary damages award that falls within statutory cap is reasonable and constitutional); *Romano v. U-Haul Int'l*, 233 F.3d 655, 673 (1st Cir. 2000) ("[A] punitive damages award that comports with a statutory cap provides strong evidence that a defendant's due process rights have not been violated."). Here, the jury awarded $5 million in exemplary damages, but the district court, as discussed more fully below, reformed the award to $1,651,184.06, which equals the maximum amount of statutory damages allowed in a case with this

level of actual damages under the civil practice and remedies code.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b).  Thus, while there are no civil penalties for comparison, the amount of exemplary damages awarded here comports with the applicable statutory cap and, to the extent that damage caps are analogous to a legislatively set civil penalty, the third *Gore* guidepost favors an award of exemplary damages.

After reviewing the "*Gore*" guideposts, we cannot say that the exemplary damage award here violates Waste Management's due process rights.  Further, the award is permissible under Texas law because, as capped by the district court, it is within the statutory range of exemplary damages allowed under the civil practice and remedies code.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b).  Accordingly, we overrule Waste Management's final issue.

## TEXAS DISPOSAL'S APPEAL

In its single issue on cross-appeal, Texas Disposal challenges the district court's application of the statutory cap on exemplary damages to the jury's $20 million award of exemplary damages.[12]  Texas Disposal does not dispute the applicability of the statutory cap to its exemplary-damages award, but rather asserts that the district court erred in its calculation of the statutory cap by erroneously characterizing the jury's $5 million award for injury to Texas Disposal's reputation as

---

[12] The statutory cap on exemplary damages is codified in chapter 41 of the Texas Civil Practice & Remedies Code.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (West Supp. 2011) (providing formula to determine the maximum amount of exemplary damages to which a claimant is entitled); *see also id.* § 41.002 (Chapter 41 "applies to any action in which a claimant seeks damages relating to a cause of action.").  Because this case was filed in 1997, or prior to the Legislature's 2003 modifications and amendments to chapter 41, the version of chapter 41 applicable here is the version enacted by the Legislature in 1995.  *See* Act of Apr. 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 110 (applicable version of Chapter 41); *see also* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 23.02(a), 2003 Tex. Gen. Laws 847, 898 (establishing effective date of Sept. 1, 2003 for Legislature's 2003 changes to Chapter 41).

"non-economic damages." *See* Former Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (exemplary damages cap). This characterization was error, Texas Disposal argues, because damages awarded to a for-profit corporation for injury to its reputation must be "economic damages" as that phrase is defined in the applicable version of chapter 41 because of the pure economic nature of a for-profit corporation. *See id*. § 41.001(5) (defining "economic damages" as "compensatory damages for pecuniary loss"). Inasmuch as the Legislature amended chapter 41 in 2003 to include "injury to reputation" in the list of specific examples of "noneconomic damages," this issue likely presents a question of first and last impression for this Court, as Texas Disposal's counsel correctly noted at oral argument. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 13.02, 2003 Tex. Gen. Laws 847, 887 (adding definition of "noneconomic damages" and including damages awarded to compensate a claimant for "injury to reputation" in that definition) (codified at Tex. Civ. Prac. & Rem. Code Ann. § 41.001(12) (West 2008)).

**Standard of review**

Our review of this issue turns on construction of the pre-2003 version of the Texas Civil Practice & Remedies Code. Statutory construction is a question of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the Legislature's intent. *See id.* We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g) (citing *Shumake*, 199 S.W.3d at 284; *Alex Sheshunoff Mgmt. Servs. v. Johnson*, 209 S.W.3d 644, 651–52 (Tex. 2006)). We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired;

52

otherwise we construe the words according to their plain and common meaning unless a contrary intent is apparent from the context. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008). We also presume that the Legislature was aware of the background law and acted with reference to it. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). We further presume that the Legislature selected statutory words, phrases, and expressions deliberately and purposefully. *See Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010); *Shook v. Walden*, 304 S.W.3d 910, 917 (Tex. App.—Austin 2010, no pet.). Our analysis of the statutory text may also be informed by the presumptions that "the entire statute is intended to be effective" and that "a just and reasonable result is intended." Tex. Gov't Code Ann. § 311.021(2), (3) (West 2005). Likewise, we may consider such matters as "the object sought to be attained," "circumstances under which the statute was enacted," legislative history, "common law or former statutory provisions, including laws on the same or similar subjects," "consequences of a particular construction," and the enactment's "title." *See id*. § 311.023(1)-(5), (7) (West 2005). However, only when the statutory text is ambiguous—i.e., susceptible to more than one reasonable interpretation—"do we 'resort to rules of construction or extrinsic aids.'" *Entergy Gulf States, Inc*., 282 S.W.3d at 437 (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)).

**Statutory cap on exemplary damages**

The applicable version of chapter 41 of the civil practice and remedies code "establishes the maximum exemplary damages that may be awarded" to a claimant in a civil case. *See* Former Tex. Civ. Prac. & Rem. Code Ann. § 41.002(b). To be entitled to an award of exemplary damages, the claimant must first prove "by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from" fraud, malice, or, in

wrongful death actions, gross negligence or a wilful act or omission. *See id.* § 41.003(a). Even after a claimant has so proven, however, any amount awarded as exemplary damages is then subject to section 41.008(b), which provides a formula for establishing the maximum amount of exemplary damages based on the character and amount of claimant's other awarded damages:

> (b) Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of:
>
> (1)(A) two times the amount of economic damages; plus
>
> (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or
>
> (2) $200,000.

*Id*. § 41.008(b) (commonly referred to as the "statutory cap" on exemplary damages). Under this calculation then, a higher economic-damage award results in a higher exemplary-damages cap. *See id.* § 41.008(b)(1)(A). The applicable version of chapter 41 does not define "non-economic damages," but it defines "economic damages" as follows:

> "Economic damages" means compensatory damages for pecuniary loss; the term does not include exemplary damages or damages for physical pain and mental anguish, loss of consortium, disfigurement, physical impairment, or loss of companionship and society.

*Id.* § 41.001(4).

Using this definition of "economic damages," the district court here determined that the $5 million in damages awarded to Texas Disposal for injury its reputation were non-economic for purposes of calculating the statutory cap, meaning that only $750,000 of the $5 million awarded for reputation damages could be used in the cap calculation. *See id.* § 41.008(b)(1)(B) (allowing

lesser of non-economic damages or $750,000). The jury's award of $450,592.03 for lost profits and expenses was Texas Disposal's only economic damages for purposes of calculating the statutory cap. Accordingly, the district court's final judgment reduced the jury's $20 million exemplary damages award to $1,651,184.06:

$450,592.03 X 2 = $ 901,184.06 (two times the amount of economic damages)

+ $ 750,000.00 (non-economic damages capped by statute)

$ 1,651,184.06

*See id.* § 41.008(b).

**Analysis**

Texas Disposal argues that the district court should have characterized the jury's $5 million award for injury to Texas Disposal's reputation as economic damages for purposes of this cap and, as a result, should have finally awarded Texas Disposal $10,901,184.06 in exemplary damages—i.e., two times an economic damages total of $5,450,592.03—arguing that damages to a for-profit corporation's reputation are economic damages as that term is defined under the applicable version of chapter 41. While Texas Disposal's argument here regarding the types of damages that a for-profit corporation can suffer makes for an interesting debate, we ultimately disagree that the reputation damages awarded by the jury here are economic damages under the applicable definition.

To determine whether the jury's $5 million award for damages to Texas Disposal's reputation should be classified as "economic" or "non-economic" damages, we look first to the applicable definition of economic damages:

> "Economic damages" means compensatory damages for pecuniary loss; the term does not include exemplary damages or damages for physical pain and mental anguish, loss of consortium, disfigurement, physical impairment, or loss of companionship and society.

*See id.* § 41.001(4); *see also Lexington Ins. Co.*, 209 S.W.3d at 85 (directing courts to look "first and foremost" at statutory text to determine the Legislature's intent). "Compensatory damages" are damages that are awarded to make up for an injury. *See Webster's* 463 (defining same as "damages awarded to make good or compensate for an injury sustained); *Black's Law Dictionary* 445 ("Damages sufficient in amount to indemnify the injured person for the loss suffered."). "Pecuniary loss" refers to a loss of money. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 531 (Tex. 2002) ("The ordinary meaning of 'pecuniary' is 'of or pertaining to money.'"); *see* also *Webster's* 1663 (defining "pecuniary" as "of or relating to money"). Thus, under the plain language of the applicable definition, "economic damages" are damages that are awarded to compensate an injured claimant for a loss of money. As such, our focus here is directed to whether the jury's award of $5 million to Texas Disposal for injury to its reputation was intended to compensate Texas Disposal for a monetary loss that it suffered—i.e., economic damages—or, by negative implication, whether the award was to compensate Texas Disposal for a non-monetary injury.

Texas Disposal presented evidence that the publication of the Action Alert caused actual monetary losses in the form of consultant and attorney expenses, lost time for its employees, lost profits due to delays in the San Antonio and Austin contracts, and carrying-cost and depreciation

expenses on equipment. Specifically, Texas Disposal presented testimonial and documentary evidence that it incurred the following types and amounts of expenses or losses as a result of the Action Alert's publication:

- $450,592.03 in consultant and attorney expenses to counteract the effects of the Action Alert's publication;

- $724,277 for the value of the time spent by Texas Disposal employees in connection with the publication of the Action Alert;

- $721,058 for estimated lost profits from contracts with the cities of Austin and San Antonio ($491,707 for San Antonio and $229,351 for Austin); and

- $304,900.61 for equipment carrying-cost and depreciation expenses incurred because of the delay in finalizing the contract with the City of San Antonio, which Texas Disposal characterized as also being part of it lost profits.

With regard to Texas Disposal's reputation, Bob Gregory of Texas Disposal testified that in his opinion, publication of the Action Alert injured Texas Disposal's reputation by causing Texas Disposal to lose credibility with the public and the environmental community and by slowing Texas Disposal's base-business growth in the two years following publication of the Action Alert. Based on Texas Disposal's calculations, Gregory estimated that, in his opinion, Texas Disposal should have earned approximately $1.9 million more in income than it actually did in the two years after publication of the Action Alert. When asked to express in monetary terms the amount of damage done to Texas Disposal's reputation, Gregory said that a business's reputation was "priceless" and almost impossible to value because it involved trust issues and standing in the environmental community, but that he estimated that it was in the range of $10 million. Gregory did not, however, testify as to what amount, if any, of the $1.9 million in foregone earnings he attributed to the publication of the Action Alert; instead, his testimony regarding the $1.9 million estimate was

more in the nature of showing a decline in Texas Disposal's business. Further, Texas Disposal asked the jury in closing argument to award $ 1,025,958 for its lost profits, $1,174,869.03 for its expenses, and for the jury to use its judgment in deciding what amount to award Texas Disposal for the "hard-to-quantify reputation" damages, using as guidance Gregory's $10 million figure, but not referring to the $1.9 million base-business figure. In sum, Texas Disposal claimed the evidence showed that publication of the Action Alert (1) caused Texas Disposal to lose $2,200,827.64 in lost profits and other expenses, and (2) injured Texas Disposal's reputation in an amount that was difficult to calculate, but that Texas Disposal would estimate at $10 million.

After hearing this evidence, the jury was asked in two questions to determine what sum of money would fairly and reasonably compensate Texas Disposal for (1) its past lost profits and reasonable and necessary expenses and (2) damage to its reputation. The jury awarded Texas Disposal, in response to the first question, $0 for its lost profits and $450,592.03 for its reasonable and necessary expenses—which amount exactly corresponds with the evidence regarding the amount it spent on consultants and attorneys—and in response to the second question, $5 million for damage to Texas Disposal's reputation. Given the evidence, Texas Disposal's characterization of the evidence, the jury charge, and the jury's award, we conclude that the jury awarded $450,593.03 to compensate Texas Disposal for its monetary losses of lost profits and other expenses—i.e., economic damages—and the jury awarded $5 million in damages to compensate Texas Disposal for the non-monetary—i.e., non-economic—injury to its reputation.

Our analysis here, with its underlying focus on the purpose of the award, is supported by the Texas Supreme Court's general characterization of reputation damages as non-economic damages in *Bentley*. *See* 94 S.W.3d at 605. While *Bentley* involved defamation of an individual

58

rather than of a corporation, the supreme court's conclusion was focused, like ours here, on the damage suffered and not on who suffered the damage: "Non-economic damages like [mental anguish, character, and reputation damages] cannot be determined with mathematical precision; by their nature, they can be determined only by the exercise of sound judgment." *See id.* Pecuniary damages—e.g., lost profits, out-of-pocket expenses for consultants and attorneys—can be determined by mathematical precision because they are concrete and already expressed in dollars. Non-pecuniary losses—e.g., harm to reputation, mental anguish—cannot be easily calculated and translated into monetary terms because they are not expressed in dollars and often not concrete. Thus, a corporation injured by defamatory remarks may suffer pecuniary losses, such as lost profits and out-of-pocket expenses, as a result of that defamation that we may correctly and easily characterize with proper proof as economic damages. But it may also suffer non-pecuniary losses—i.e., non-economic losses—such as injury to its reputation that cannot be readily quantified or translated into a monetary loss—e.g., loss of standing in the community and tarnished image. There is some logic to Texas Disposal's argument that because a corporation's reason for being is pecuniary in nature, it can suffer only pecuniary damages, but the fact remains that Texas Disposal can and did suffer the type of injury to its reputation that is similar in nature to that suffered by an individual—i.e., loss of standing, tarnished image—that did not result in a direct or readily measurable pecuniary loss to Texas Disposal.[13]

---

[13] In a related argument, Texas Disposal asserts that "economic damages" mean damages that can be estimated and compensated by money, and that damages for injury to a for-profit corporation's reputation fit within this definition because injuries to a for-profit corporation's reputation can be estimated, valued, and compensated in monetary terms. But all damages, including obviously non-economic or non-monetary damages, can be and are regularly estimated in and compensated by money. *See Black's Law Dictionary* 447 (9th ed. 2009) (noting in its definition of "damages" that phrase "pecuniary damages" is a redundancy because damages are always pecuniary).

Texas Disposal argues that, based on the language of the applicable statute, damages awarded to a corporation for injury to its reputation are economic damages because the statute's definition does not list "injury to reputation" in its list of excluded damages. *See* Former Tex. Civ. Prac. & Rem. Code Ann. § 41.001(4). This argument suggests that the definition's list of excluded damages is exhaustive, but there is no indication of such an intent in the text of the definition and, further, the list of excluded damages fails to include some other types of damages that, while not listed, are obviously not pecuniary losses—e.g., loss of enjoyment of life. *See* Tex. Gov't Code Ann. § 311.005(13) (West 2005) ("'[i]ncludes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded"); *Texas Health Ins. Risk Pool v. Southwest Serv. Life Ins. Co.*, 272 S.W.3d 797, 804 (Tex. App.—Austin 2008, no pet.); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 41.001(12) (including "loss of enjoyment of life" in current definition of "non-economic" damages). At most, this omission of reputation from the list of excluded damages merely indicates that reputation damages, and for that matter any other unlisted damages, are not expressly *excluded* by definition. It does not, however, obviate the definition's initial requirement that, to be considered economic damages, the damages must have been awarded to compensate the injured party for its pecuniary losses.

In a related argument, Texas Disposal argues that because all of the excluded damages are types of injuries that only individuals can suffer, then it necessarily follows that only those types

---

Also, based on the plain language of the Legislature's definition of economic damages, what is important for our determination here is the purpose of the award—i.e., whether the award compensates Texas Disposal for a monetary loss or, by negative implication, a non-monetary loss—and not whether the loss can be estimated and compensated with money.

of damages—i.e., that are ordinarily available only to people and that are "highly subjective" to a person's feelings or pain—can be said to be excluded from the applicable definition of economic damages. Because a corporation cannot suffer these types of personal damages, Texas Disposal concludes, any damages to a corporation must be economic. But as discussed above, the fact that a corporation's reason for being is pecuniary does not preclude it from suffering non-monetary losses, such as its standing in the community, that cannot be readily translated into money damages. More important to our analysis here, however, is the fact that the statutory list of excluded damages is not exclusive. *See* Tex. Gov't Code Ann. § 311.005(13).

Finally, Texas Disposal argues that the Legislature's 2003 amendment to chapter 41, which specified that reputation damages are non-economic, demonstrates that reputation damages to a corporation were considered economic damages under the prior definition applicable here.[14] Stated another way, Texas Disposal argues that the 2003 modifications to chapter 41 changed

---

[14] In 2003, the Legislature amended section 41.001 to modify the definition of "economic damages" and to add a definition for "noneconomic damages" that includes reputation damages:

(4)     "Economic damages" means compensatory damages intended to compensate a claimant for actual economic or pecuniary loss; the term does not include exemplary damages or noneconomic damages.

. . . .

(12)    "Noneconomic damages" means damages awarded for the purpose of compensating a claimant for physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment of life, *injury to reputation*, and all other nonpecuniary losses of any kind other than exemplary damages.

*See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 13.02, Tex. Gen. Laws at 887 (codified at Tex. Civ. Prac. & Rem. Code Ann. § 41.001(4), (12) (West 2008) (emphasis added).

61

reputation damages from economic to non-economic, at least for purposes of a for-profit corporation. We find this argument unpersuasive, if only for the reason that a similar argument could easily be made for the opposite construction—i.e., that the 2003 amendment clarifies the already existing rule that reputation damages are non-economic damages. But more importantly, our analysis here is restricted to the text of the applicable statute, not the text of the later-modified statute. *See Texas v. Fidelity & Deposit Co. of Md.*, 223 S.W.3d 309, 311 (Tex. 2007) (declining to consider the Legislature's post-petition modifications to statute and instead confining its analysis to the applicable statute as it existed prior to modification). But even considering the 2003 amendments to chapter 41, Texas Disposal's argument is not persuasive because the 2003 amendments did not significantly change the existing statute. Rather, the amendments merely altered the format of the definitions by removing the list of excluded damages from the definition of economic damages and including them with an added definition of "non-economic damages"; by expanding the definition of "economic damages" to "compensatory damages intended to compensate a claimant for actual economic or pecuniary loss"; and by further enumerating non-economic damages. These modifications did not, however, change the rule that economic damages are damages awarded to compensate a claimant for a pecuniary loss, nor did they change the fact that the newly listed non-economic damages would have been non-economic damages under the pre-2003 statute to the extent that they did not compensate a claimant for non-pecuniary losses. *See Williamson Pointe Venture v. City of Austin*, 912 S.W.2d 340, 345 (Tex. App.—Austin 1995, no pet.) (noting that if later legislation differs significantly from existing law, that later legislation changes rather than clarifies existing law (citing *Tijerina v. City of Tyler*, 846 S.W.2d 825, 828 (Tex. 1992)).

Finally, we note that under Texas Disposal's construction of chapter 41, the cap on exemplary damages would apply differently, in effect, to individuals than it does to corporations. Corporations, to the extent that they could only suffer economic damages, could benefit from a higher statutory cap than would individuals suffering the same damages. Applying this construction to the facts of this case, individual suffering the same damages would be entitled to $1.6 million in exemplary damages, whereas Texas Disposal the corporation would be entitled to $10.9 million in exemplary damages. There is nothing in text of the statute, in the case law, or in chapter 41's legislative history that suggests that such an outcome was intended or is desirable.

We hold that the jury's award for injury to Texas Disposal's reputation is non-economic and thus, the district court correctly applied the statutory cap on exemplary damages. We overrule Texas Disposal's issue.

## CONCLUSION

Having overruled each of the parties' issues, we affirm the district court's judgment.

_____

Jeff Rose, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed: May 18, 2012

63